Good morning. Thank you, Your Honors. My name is Morgan Russell for the petitioner Amritpal Singh. This petition concerns a challenge to the agency's adverse credibility determination in an asylum case. There is three areas that the BIA addressed in upholding the IJ's adverse credibility determination that are before the court. First, the government raised the issue of exhaustion. I think for the reasons set out in the reply brief, all of these issues are plainly before the court, perhaps first and foremost because, as stated in, for example, the Rodriguez-Castillon decision cited in the reply brief, because the BIA addressed these issues on the merits, those are all before the court. I'd also direct the court to this court's decision in G. V. Holder, ZHI 751 F3, 1088 from 2014, which makes clear that any challenge to an overall credibility determination also exhausts any subparts of that determination. That's at page 1094, note 5. So the first area on the merits of the credibility determination is sort of the, how the July 2010 attack in this case began. And there's two, we could say, subparts to that. One is the issue of his briefly inconsistent testimony on cross-examination as to whether the attackers called his name or not. And really what he says — Counsel, why do you denote that as briefly inconsistent? So you acknowledge it was inconsistent. Well, so I guess I really don't think it's quite inconsistent. What exactly happens is he's asked if they called his name. He says they did. Then he's asked if they knew and used his name. He says, I don't know. And then he's asked again if they said his name. And he says, yes, they took my name. They said my name. The overall issue was, how would these alleged persecutors know who he was to attack him? Right. And he ultimately explains that with respect to the first attack, he doesn't know. He doesn't know how they knew him. He doesn't know how they knew his name. He does say, with respect to him saying that response of, I don't know, to whether they knew and called his name, he does say at AR-81 that he didn't understand the question. And that's his sort of explanation for why he said, I don't know. There are a number of points in this transcript where there was pretty obvious interpretation issues, including sort of in that area, but also between pages AR-106 and 108, which was cited in the opening brief, but also a number of other areas around the transcript. So counsel, for the first attack, we're talking about July 2010. Yes, that's right. So I thought that he said that he knew his attackers were members of the Dal Badal party because of the emblem on their motorcycles. Yes. That's what he said about how he knew that they were Bottle Party members. And he said they demanded that he leave his party to join theirs. So how would he know, how would they know what party he was in? Oh, I certainly don't know. And he didn't say. And he said he doesn't know. And he doesn't know how they knew his name. The one, the one area. Well, I thought he said, when he was asked how his attackers recognized him as a member of the party, he stated that he recognized his attackers from the Guadalajara. Right. And so that's the other sort of little part of this first issue about the beginning of that lie attack. Don't you think that's a discrepancy for him to first say he didn't know and then to say he recognized them from the Guadalajara? Yeah. I would say that's a discrepancy. But I would say that, as we argued in the briefs, that that's the kind of quickly corrected mistake that I don't think supports the determination that was drawn here, particularly because, and that's sort of the language about a quickly corrected mistake as to this Court's decision in Wren where the Petitioner in that case went back and forth on the year of a baptism. The government argues this is an analogous to that because that's just a date. But I think here, I really do think it seems like a very similar, very momentary slip of mind. He said he was nervous upon being pressed about this. And although it's not But he was asked to clarify. He didn't correct it immediately. It was only when he was asked to clarify that he revisited the fact, right? Yes, that's right. But just before that, he had said he didn't recognize them. Then he's asked, and he says, I recognize them from the Gurdwara. And then DHS counsel says, understandably, well, you just said you didn't recognize them. I think here, especially because the, I think it seems pretty clear in the context here, which the IJ didn't address or consider, where in the second attack, he did recognize the people from his village, would have seen them at the Gurdwara where he was, where he went to join his party and where various party events took place. I think it seems pretty clear or likely from the context that he, for a moment, was confused about the two attacks which he was being asked about. I think in that context, which the agency didn't address, I think it's really quite analogous to the momentary mistake on the year of the baptism in Rennes. Do you think we're compelled to reach that conclusion on these facts? I think to the same extent that the Court reached that conclusion in Rennes, I think so. I think it's very similarly a slip that, as the Court said in Rennes, would be one that witnesses make in all innocence that has to be distinguished from one that really bears on the petitioner's veracity. So that's what I'd say about that incident. The other two issues were the fact that this, his second attempt to report that first July 2010 attack to the police when he went with both his father and the village council leader, which was called the Sarpanch, to try to report it. And his testimony about living sort of in hiding, partly at his parents' home and partly with other relatives in his village, wasn't set forth in the sort of supplement page to his asylum application. I think under this Court's decision in Lye, I really don't see how those can be held to support the adverse credibility determination here. Omission from an application of the fact that he had to go into hiding, you don't think that's an important fact that would have been included? Well, I think it's one that certainly could have been included, but in the one-page supplement on the application here, there's all sorts of things that weren't included. He doesn't really describe any of the events of either attack, where they took place, how many people there were. He doesn't talk about his — which family members were involved in the party. He doesn't talk about the past threats or the attack on his father. So there's lots of things that weren't mentioned. There's some important things that were. But as this Court said in Lye, quoting this Court's earlier decision in Bondari, it's well established that mere omission of details is insufficient to support an adverse credibility finding. But an important detail like that, and when he was asked why he didn't put it in the questionnaire, his explanation was he cannot write much. Well, I think that that's not nearly as baffling as the I.J. suggested. I mean, I think he didn't — it seems to me like the reason he didn't write out his own version of events in longhand and at length with more detail is that he couldn't write himself. So he's limited to whatever information his attorney put down, and his attorney chose to not prepare a sort of detailed, multi-page, separate declaration of the kind this Court sees in many of these cases, and instead limited — the attorney limited theirself to sort of whatever they happened to fit on that one-page supplement in the application itself. I do think, looking back at the Court's decision in Bondari, which is in the same page quoted in Lye from 2014 — this is Bondari v. INS, 227 F. 3rd at 1167. The Court said that an I.J.'s subjective view of what a persecuted person would include in his asylum application has no place in an adverse credibility determination. That was a pre-Real ID case, but under the Real ID Act, one of the requirements is that an I.J., although they can rely on lots of different things and doesn't have to go to the heart of the claim, they have to consider the circumstances under which the statements are made that they're comparing to say it's an inconsistency or an omission. I think in this context where it's this very short statement that's not a separate declaration, as the I.J. said in her decision, and which lots of information is omitted, I think it's speculative under that reasoning for the I.J. to sort of conjecture about what he should have, a version of included, when it's a bit haphazard what went in there and what didn't by the attorney. I'll try to save the last few seconds. All right. Thank you, counsel. Thank you. We'll hear from the government. Good morning, Your Honors. Good morning. May it please the Court. Sana Lee representing the Attorney General. Your Honors, as you've pointed out, in this case, the standard of review is that the record must compel the conclusion that the back finders reached the wrong conclusion in this case. And in this case, the petitioner has not been able to do so. As we've already discussed, there were numerous inconsistencies in this claim. And starting with the first one, how the attackers knew that the petitioner was a member of the sad party. And the petitioner, excuse me, his testimony was very inconsistent about this. First, he said he didn't recognize these people. And then later, at one point, he said, well, they flagged me down and stopped me and signaled me. And then he later says, well, you know, how did they recognize you? And he said, well, I know them from the Gurdwara. And it was only, like you said, Judge Rawlinson, when he was asked about this inconsistency, well, wait, I thought you said you didn't recognize them. And then, at that point, he said, oh, I was mistaken. And that was, I think, the extent of his explanation besides the fact that he was a little scared also. And so that was not a minor inconsistency and it was not correctly, quickly corrected as Petitioner's Counsel's claims. And furthermore, when he said that they called his name, that came out on cross-examination. And then he said, well, I don't know if they called my name when he was asked further about that. And then he changed his testimony again to say, yes, they did call my name. And so, based on this evidence, the IJ and the Board were permitted to conclude that he did not testify credibly about this incident. It's not clear what happened, how he knew these people, or if he knew them, or if they knew him, and how they recognized that he was a member of this party. And that all goes to the heart of his claim, that he was persecuted for being a member of his political party. And then, furthermore, his counsel now tries to raise translation issues, where that was never raised below to the- He didn't say that to us. He didn't discuss translation issues when he was at the lectern. I believe he just raised some issues about translation. All right. Go ahead. I'm sorry. And he mentioned it in his brief as well. He didn't stress it as a main argument, but he did raise it, where it was never raised below to the agency. And regarding the testimony- What about your exhaustion argument? Well, Your Honor, he did challenge the adverse credibility determination to the board, but he didn't raise these specific issues, challenging these areas of inconsistencies. But what about the fact the board addressed them? What does that do to your exhaustion argument? Well, Your Honor, I believe that the court can review the adverse credibility determination. So are you ceding your exhaustion argument? We are not ceding the argument, but I think that even if- What's your basis for saying that the petitioner failed to exhaust the adverse credibility issue? I don't think that he failed to exhaust that whole issue, but he raises very clearly that the IJ should have told him to provide a detailed declaration, where that is- He never said that to the board. And furthermore, even if he did say it to the board, the asylum application clearly states that you need to provide a detailed account of what happened to you. And so even if the IJ didn't tell him, well, you need to provide this information, it's clear from the application itself that he needed to do so. And so- And regarding that omission, that was an important omission. It went to his fear of these people who supposedly harmed him based on his political affiliation. And so that's not just a minor detail, and he should have included it in his asylum application, even if it was just typed in the actual application, and not like a separate detailed statement. I'm sorry, a separate typed statement. And also, finally, the petitioner's evidence didn't support his claim as far as the Sarpanch's letter did not support the claim that the Sarpanch went to the police station with him, where he said that first he went with his father, and then he went once, and then he later said, well, I actually went twice, and I went with my father and the Sarpanch. And the Sarpanch's letter does not include that information at all. And if Your Honors have no further questions, the government will rest. It appears not. Thank you. Thank you. Rapado. Counsel, did I miss something? Are you raising a translation issue here? Well, I did. I did. The counsel is right that the opening brief does mention. I meant when you were here arguing. I did mention that there is one area referenced in the opening brief at AR 106-108 where there is a clear confusion that's interpretation. I mentioned that there are a number of other ones, which I think is true throughout the transcript. It's certainly not the heart of what I'm saying. Are you saying that that's an explanation for the inconsistencies? Well, I mentioned it specifically with respect to his answer of, I don't know. I think that's at AR 107 to when they said, did they know and call your name? He first says, I don't know, and then on the next page says, I didn't understand the question. And I think that the interpretation issue there, as consistent with the many interpretation issues throughout this, goes to that point. So she's right that I did raise that before. Just very briefly, in terms of these things coming up on cross, as counsel mentioned, I think if anything under this Court's decision in lie, the reasoning there would suggest that that really undercuts the adverse credibility determination, where, you know, especially his explanation about the sarpanch, it's just as in lie. You could kind of track it word for word that it came up in response to very specific questions on cross-examination by the government attorney that he couldn't have anticipated. There's no indication that there's some sort of, you know, lag or time, you know, trying to buy time in response to those questions. The government attorney asks him a number of questions, and he, in response, kind of immediately gives this information about how they went to the sarpanch after the police refused them. The sarpanch was going to go with them. His mother died. He couldn't go until a week later. And it seems to be quite a, you know, fluid information that he gives in response to these very specific questions. Can I ask just one question about the, there are multiple reasons that the BIA ultimately upheld the adverse credibility determination on. If we were just to agree with one of those, because it's really the first one. I'm kind of with you on the rest. But the first one, I think there, at least arguably, is evidence to support that one. If that's all that we were to conclude is supported by the record, does the decision nonetheless stand? I think that this court, in that situation, could and should remand for a new analysis under the totality of the circumstances as required by the Real ID Act. I don't actually have a published decision in which this court has done that under the Real ID Act. But there was an unpublished decision, Balwinder-Singh v. Sessions, 719F Appendix 595 from last year, from last December, in which the court did just that. And I have some copies of that here. But, counsel, don't we have published cases that say if just one of the reasons to deny credibility stands, that's enough to sustain the decision? Those are based on, that's true. And I think there's even a published decision post-Real ID, to be fair. But it goes back to, in quotes from pre-Real ID Act cases, in which an inconsistency had to go to the heart of the claim. And I think under that ---- That's an even higher standard. Well, it's a higher standard, but it also means that any inconsistency the Board could legitimately rely on had to be a major inconsistency going to the heart of the claim. I think under that regime, it makes sense that the court, if they're going to uphold one of those things going to the heart of the claim, would have to uphold the determination. I think here, where that is no longer the case, and I don't think these inconsistencies, even the first one, goes to the heart of his claim, given the sort of tic-tac-toe way it was stated and misstated and then corrected immediately. How they recognized him as a member of the party doesn't go to the heart of his claim? Well, I think here, where he said he didn't know them, and then slips up just a moment later, seemingly confusing it with the other incident, and then immediately goes back and admits that he was mistaken because he got nervous, I don't think that's the kind of inconsistency that would have upheld an adverse credibility determination on its own pre-Real ID. So I do think under the new regime, as the court sent at least one other case, I think it would be appropriate to send it back. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case is Rahm v. County of Sacramento.
judges: Tashima, Rawlinson, Watford